COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Clements and Kelsey
Argued at Richmond, Virginia


PATRICK W. FINNERTY, DIRECTOR,
 VIRGINIA DEPARTMENT OF MEDICAL
 ASSISTANCE SERVICES
                                                    OPINION BY
v.        Record No. 2082-03-1            JUDGE D. ARTHUR KELSEY
                                              MARCH 9, 2004
THORNTON HALL, INC.


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John C. Morrison, Jr., Judge

Paige S. Fitzgerald, Special Counsel (Jerry W. Kilgore, Attorney
General; David E. Johnson, Deputy Attorney General; Siran S.
Faulders, Senior Assistant Attorney General, on briefs), for
appellant.

Laura G. Aaron (Jessica S. Jones; Healthcare Regulatory Advisors,
Inc., on brief), for appellee.


In Smith v. Liberty Nursing Home, Inc., 31 Va. App. 281, 297, 522 S.E.2d 890, 897-98

(2000), we held that Code § 32.1-325.1:1(B) establishes a "mandatory limitation" period within

which the Virginia Department of Medical Assistance Services (DMAS) must make an "initial

determination" of Medicaid overpayment to a provider.  The failure to meet this deadline bars any

administrative claim seeking reimbursement of the overpayment. Id.  The case now before us

requires that we decide what constitutes an "initial determination."

The trial court found that an "initial determination" for purposes of Code §§ 32.1-325.1(A)

and 32.1-325.1:1(B) refers to the agency's decision pursuant to an informal factfinding conference

conducted under Code § 2.2-4019 (formerly Code § 9-6.14:11).  On appeal, Patrick W. Finnerty,

Director of DMAS, contends that the term actually refers to an earlier administrative notice (called a

Notice of Program Reimbursement) issued before the informal factfinding conference. We agree with the trial court's interpretation, and thus, affirm its decision.

I.

DMAS administers the Medicaid program for the Commonwealth. Virginia law authorizes the Director of DMAS to "receive and expend federal funds" and to enter into contracts "necessary or incidental to the performance of the Department's duties." Code § 32.1-325. The Director also supervises an auditing system that reviews the annual cost submissions of participating providers "to determine the propriety, necessity and reasonableness of reimbursable costs." After an audit of a provider's annual cost submission, a DMAS "Reimbursement Analyst" issues a Notice of Program Reimbursement (NPR) outlining proposed allowed and disallowed costs for that particular accounting period. If the provider agrees with the analyst's proposal, the process ends. If the provider disagrees, DMAS conducts an "informal conference" under Code § 2.2-4019 so that the agency has an opportunity to "ascertain the fact basis" for any decision it makes. If the dispute continues, it then goes to a formal administrative hearing under Code § 2.2-4020 and later to the courts under Code §§ 2.2-4025 to 2.2-4030.

Thornton Hall, Inc., a participating provider, offers nursing care and services to the public through its nursing home, Thornton Hall. The nursing home submitted various cost reports for fiscal years ending (FYE) December 31, 1991 through 1994, fiscal periods ending June 30, 1995 and December 31, 1995 and FYEs December 31, 1996 through 1999. A cost analyst at the accounting firm Clifton Gunderson PLLC, on contract with DMAS, issued NPRs to Thornton Hall identifying overpayments for the applicable accounting periods. Each of the NPRs was issued within four years of the overpayments identified in the respective NPR.

DMAS conducted informal factfinding conferences (IFFCs) pursuant to Code § 2.2-4019 for all NPR periods except the FYE 1992 NPR.[1] The IFFCs, however, were not conducted until July 6, 2001, and September 25, 2001. Because DMAS conducted the IFFCs more than four years from the date of the 1991, 1993, 1994, 1995, and 1996 overpayments, Thornton Hall argued that Code § 32.1-325.1:1(B)'s four-year statute of limitation barred DMAS from recouping any alleged overpayments. The IFFC hearing officers rejected this argument, finding that the NPRs issued by the cost analyst within the limitations period constituted the agency's initial determination. Thornton Hall disagreed and requested formal hearings under Code § 2.2-4020.

The first formal hearing officer concluded that the IFFC, not the NPR, was the initial determination. As a consequence, he reasoned, DMAS could not recoup "overpayments more than four years from the date of the initial determination on July 6, 2001." Thornton Hall filed a letter requesting that DMAS adopt the formal hearing officer's recommendation. In a Final Agency Decision dated January 22, 2002, however, the Director rejected the recommendation as constituting "an error of law."

A second formal hearing officer likewise found that under Code § 32.1-325.1:1(B) "recoupment of overpayments made by DMAS to Thornton Hall, Inc. prior to July 6, 1997 are time barred as a matter of Virginia law." Once again, however, the Director rejected the hearing officer's recommendation in a Final Agency Decision dated August 15, 2002.

Thornton Hall appealed both Final Agency Decisions to Norfolk Circuit Court. Disagreeing with the Director's argument that an NPR is an "initial determination," the trial court held that the "clear language" of Code § 32.1-325.1:1(B) "indicates that there must be an

---

[1] Thornton Hall waived the IFFC for FYE 1992 and "proceeded by record." DMAS then issued a decision on May 2, 1995, pursuant to the IFFC provision of current Code § 2.2-4019. Thornton Hall appealed that decision pursuant to current Code § 2.2-4020.

IFFC before there can be an initial determination." Finding that the earliest IFFC did not occur until July 6, 2001, and that "there are no tolling provisions in the statute," the court ruled "that DMAS cannot collect for any repayments to Thornton Hall prior to July 6, 1997."

## II.
## A.

The Director first argues that the trial court erred by "failing to consider DMAS's expertise and specialized competence in interpreting its own statutes and regulations." According to the Director, "the interpretation of what constitutes an 'initial determination'" under Code §§ 32.1-325.1 and 32.1-325.1:1(B) falls within DMAS's specialized competence and the trial court should have deferred to its interpretation. We disagree.

An agency does not possess specialized competence over the interpretation of a statute merely because it addresses topics within the agency's delegable authority. See generally 7-Eleven, Inc. v. Dep't of Envtl. Quality, 42 Va. App. 65, 73, 590 S.E.2d 84, 88 (2003) (*en banc*) (observing that "no special agency expertise is necessary" for a resolution of issues of pure statutory construction).[2] As the Virginia Supreme Court recently reaffirmed, an "erroneous interpretation of a statute by those charged with its enforcement" cannot override the statute's "clear meaning." Volkswagen of Am., Inc. v. Smit, 266 Va. 444, 453, 587 S.E.2d 526, 531 (2003) (quoting Hampton Roads Sanitation Dist. Comm'n v. City of Chesapeake, 218 Va. 696, 702, 240 S.E.2d 819, 823 (1978)). "In sum, pure statutory interpretation is the prerogative of the judiciary." Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908

---

[2] In contrast, we afford great deference to the Director when reviewing "DMAS's interpretation and application of its own regulations." Dep't of Med. Asst. v. Beverly Healthcare, 41 Va. App. 468, 481, 585 S.E.2d 858, 865 (2003). The decision before us, however, involves only a question of statutory interpretation.

(1996).[3] This axiom stems from basic principles of separation of powers. "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Virginia courts do not delegate that task to executive agencies.

The trial court, therefore, did not err in refusing to defer to the Director's definition of "initial determination" because it involves a pure question of statutory interpretation, a matter within the core competency of the judiciary.

B.

The Director next argues that, whether we defer to him or not, our *de novo* interpretation of the statute should lead us to the same conclusion he reached. For the following reasons, we reach the opposite conclusion.

Our analysis begins with two familiar principles of statutory construction. First, when the legislature uses the same word or phrase "in different parts of the same statute, the presumption is that it was used in the same sense throughout the statute, unless a contrary intention clearly appears." Bridgewater Mfg. Co. v. Funkhouser, 115 Va. 476, 480, 79 S.E. 1074, 1076 (1913); see also Bd. of Supervisors of Albemarle County v. Marshall, 215 Va. 756, 761-62, 214 S.E.2d 146, 150 (1975); Weaver v. Commonwealth, 25 Va. App. 95, 101, 486 S.E.2d 558, 561 (1997).

Second, "we consider all relevant provisions of a statute and do not isolate particular words or phrases." Lee County v. Town of St. Charles, 264 Va. 344, 348, 568 S.E.2d 680, 682 (2002). "Statutes which have the same general or common purpose or are parts of the same general plan are also ordinarily considered as *in pari materia*." Lucy v. County of Albemarle,

---

[3] We have consistently followed this principle. See Va. Imports, Ltd. v. Kirin Brew. of Am., LLC, 41 Va. App. 806, 821, 589 S.E.2d 470, 477 (2003); Penn v. Commonwealth, 32 Va. App. 422, 426, 528 S.E.2d 179, 181 (2000); Morris v. Va. Retirement Sys., 28 Va. App. 799, 803, 508 S.E.2d 925, 927 (1999); Gen. Trading Corp. v. Motor Vehicle Dealer Bd., 28 Va. App. 264, 266, 503 S.E.2d 809, 811 (1998).

258 Va. 118, 129, 516 S.E.2d 480, 485 (1999). We thus consider "the entire body of legislation and the statutory scheme to determine the 'true intention of each part.'" McCray v. Commonwealth, 37 Va. App. 202, 204, 556 S.E.2d 50, 51 (2001) (citation omitted). And "when a controversy involves a number of related statutes," we construe them "together in order to give full meaning, force, and effect to each." Ainslie v. Inman, 265 Va. 347, 353, 577 S.E.2d 246, 249 (2003).

Guided by these two principles, we turn to Code § 32.1-325.1:1(B). That statute establishes the mandatory limitations period by declaring that

> upon making an *initial determination* that an overpayment has been made to the provider pursuant to § 32.1-325.1, the Director shall notify the provider of the amount of the overpayment. *Such initial determination* shall be made within the earlier of (i) four years or (ii) fifteen months after the filing of the final cost report by the provider subsequent to sale of the facility or termination of the provider.

(Emphasis added); see Liberty Nursing Home, Inc., 31 Va. App. at 290, 522 S.E.2d at 894. Code § 32.1-325.1, in turn, requires the Director to "make an *initial determination* as to whether an overpayment has been made to a provider in accordance with the state plan for medical assistance, the provisions of Code § 2.2-4019 [formerly Code § 9-6.14:11] and applicable federal law."[4] Code § 32.1-325.1(A) (emphasis added). And Code § 2.2-4019(A) requires an agency to "ascertain the fact basis" for its decision through an IFFC unless the agency and the provider waive the IFFC and "go directly to a formal hearing."

We agree with the trial court that the phrase "initial determination" in Code § 32.1-325.1(A) means the same thing as the identical phrase in Code § 32.1-325.1:1(B). The

---

[4] In 2001, the General Assembly recodified the Virginia Administrative Process Act at Code §§ 2.2-4000 to 2.2-4033. See 2001 Va. Acts, ch. 844. The General Assembly also amended Code § 32.1-325.1 to comport with its recodification of the Virginia Administrative Process Act. Id.

first use of the phrase commands DMAS to "make an initial determination" and the second use of the phrase merely places a deadline on making it. Whatever meaning the phrase has in one should be carried forward into the other.

Code § 32.1-325.1(A) provides that DMAS "shall make an initial determination as to whether an overpayment has been made to a provider in accordance with the state plan for medical assistance, the provisions of § 2.2-4019 and applicable federal law." The Director argues that "initial" means first and "determination" means a decision. Because an NPR constitutes the first decision on overpayment, he reasons, the NPR should be deemed the agency's "initial determination." That logic, while persuasive at first glance, ultimately fails because it takes the phrase in isolation and severs it from the significant qualification that follows.

The "initial determination" must be "*in accordance with*" three things: the state plan, the provisions of § 2.2-4019, and applicable federal law. The first and third qualifiers, the state plan and federal law, primarily address the substantive methodology for establishing the amount of overpayment — including the manner of its calculation, the reasonableness of the charges, the allowed and disallowed costs, and the like. See generally 12 Va. Admin. Code § 30-90-20 *et seq.*; 42 C.F.R. § 433.300 *et seq.* Though they mention various stages of the reimbursement process, neither the federal nor the state regulations define the expression "initial determination," determine its timing, or provide any specific procedures unique to it.

The second qualifier — "the provisions of § 2.2-4019" — deals exclusively with the decision-making process. That statute describes the procedure for conducting an IFFC, the first quasi-adjudicative opportunity for agencies to "ascertain the fact basis" of their decisions in disputed cases. Code § 2.2-4019(A). By mandating that the initial determination be "in accordance with" the IFFC process, Code § 32.1-325.1(A) necessarily equates the two. To be

sure, the initial determination can hardly be "in accordance with" the IFFC procedures if the former occurs before the latter. Because the NPR always precedes the IFFC, the NPR cannot be issued "in accordance with" an IFFC — something that has yet to take place.

The Director claims we read this statutory language too literally. As he sees it, the NPR is "in accordance with" the IFFC, at least in a loose sense, because the provider can always appeal the NPR to the IFFC. This interpretation, however, fails to give these terms "their ordinary meaning, given the context in which they are used." 7-Eleven, Inc., 42 Va. App. at 73, 590 S.E.2d at 88 (citation omitted). One would not ordinarily say, for example, that a trial court should conduct a trial and issue its decision "in accordance with" the rules of appellate procedure. Though the administrative jargon of this case obscures this syntactic weakness in the Director's interpretation, it still boils down to just that. [5]

Even so, the Director asserts, the IFFC decision cannot be the same as the "initial determination" because that would require the Commonwealth to repay the federal government's share of the overpayment before the Commonwealth collects it from the provider. Cf. 42 C.F.R. § 433.302 *et seq.* Such an interpretation, he argues, would be inconsistent "with federal law." We disagree. Under federal law, the "agency must refund the Federal share of overpayments at the end of the 60-day period following discovery in accordance with the requirements of this

---

[5] The agency actions in this case preceded the 2000 amendment to Code § 32.1-325.1. Before the amendment, subsection (B) stated: "An appeal of the Director's initial determination concerning provider reimbursement shall be heard in accordance with the Administrative Process Act (§ 9-6.14:1 *et seq.*) and the state plan for medical assistance provided for in § 32.1-325." Prior to the recodification of VAPA in 2001, Code "§ 9-6.14:1 *et seq.*" was a citation to the entire VAPA, which would include both the IFFC and formal hearing procedures. The 2000 amendments, however, clarified the point by providing: "An appeal of the Director's initial determination concerning provider reimbursement shall be heard in accordance with § 9-6.14:12 of the Administrative Process Act (§ 9-6.14:1 *et seq.*) . . . ." Code § 9-6.14:12, now Code § 2.2-4020, referred only to the VAPA's formal hearing process, which necessarily follows the IFFC "initial determination." The Director argues we should not apply this amendment retroactively. Our decision, however, does not apply the amendment at all. We rely entirely on the text of the statute as it existed prior to the 2000 amendment.

subpart, *whether or not* the State has recovered the overpayment from the provider." 42 C.F.R. § 433.312(a)(2) (emphasis added). It also provides a mechanism for "reclaiming" the federal share if the overpayment is "adjusted downward" under approved procedures. 42 C.F.R. § 433.320(c). The interpretation we adopt, therefore, closely parallels federal law.[6]

The Director also argues that our interpretation conflicts with Liberty Nursing Home, Inc. which, he contends, treated the NPRs in that case as initial determinations within the meaning of Code §§ 32.1-325.1(A) and 32.1-325.1:1(B). See Liberty Nursing Home, Inc., 31 Va. App. at 289, 522 S.E.2d at 894. Indeed it did. But the parties did not raise the issue on appeal; nor did we discuss it. And at no point were we asked to interpret the phrase "initial determination" under Code §§ 32.1-325.1 or 32.1-325.1:1. As a result, we did not *hold* that an NPR constituted an "initial determination." We simply assumed it did because that was the way it was presented to us. Under Virginia law, the doctrine of *stare decisis* does not "foreclose inquiry" into an issue not previously "raised, discussed, or decided." Chesapeake Hosp. Auth. v. Commonwealth, 262 Va. 551, 560, 554 S.E.2d 55, 59 (2001). As a result, Liberty Nursing Home, Inc. does not relieve us of our present responsibility to decide the issue.

C.

Finally, the Director contends that even if the IFFC decision constitutes the "initial determination," the trial court nonetheless erred by not equitably tolling the limitations period.

---

[6] In addition, the Director claims that requiring the Commonwealth to "repay the federal share long before it can be collected from providers" creates an "illogical" absurdity that the General Assembly could not have possibly intended. In terms of gauging what is absurd or not absurd, at least on this issue, we need go no further than the 2000 amendment to Code § 32.1-325.1(B), which delayed recovery even further by mandating: "Prior to a final agency case decision issued in accordance with § 2.2-4023 [issued after the *formal* agency appeal], the Director may not undertake recovery of any overpayment amount paid to the provider through offset or other means." Code § 32.1-325.1(B). Our pre-2000 interpretation, therefore, cannot be characterized as a legislative absurdity unless one is prepared to say the 2000 amendment should be dismissed as an even greater absurdity — a conclusion we are unwilling to reach.

Because Thornton Hall requested that the IFFCs be continued, the Director argues, the trial court should have found that Thornton Hall was equitably estopped from claiming protection under the limitations period of Code § 32.1-325.1:1(B).

To begin with, no Virginia case addresses whether equitable estoppel applies in this statutory context. As a general rule, "[s]tatutes of limitations are strictly enforced and exceptions thereto are narrowly construed. Consequently, a statute should be applied unless the General Assembly clearly creates an exception, and any doubt must be resolved in favor of the enforcement of the statute." Arrington v. Peoples Sec. Life Ins., 250 Va. 52, 55, 458 S.E.2d 289, 290-91 (1995); see also Rivera v. Witt, 257 Va. 280, 283, 512 S.E.2d 558, 559 (1999).[7] In this case, however, we need not address whether equitable estoppel can ever toll the four-year limitations period of Code § 32.1-325.1:1(B) because, as a practical matter, the Director's proffer did not make out a *prima facie* case of equitable estoppel.

"To prove estoppel, a claimant must show by 'clear, precise and unequivocal evidence' that he relied to his detriment upon an act or statement" of the other party to refrain from taking action "within the statutory period." Jenkins v. Ford Motor Co., 27 Va. App. 281, 288, 498 S.E.2d 445, 449 (1998) (quoting Rose v. Red's Hitch & Trailer Servs., Inc., 11 Va. App. 55, 59-60, 396 S.E.2d 392, 395 (1990)). These requirements take into account the admonition that any "invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." Chao v. Va. DOT, 291 F.3d 276, 283 (4th Cir. 2002) (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)) (internal quotation marks omitted).

---

[7] Cf. Safeway Stores v. Milk Comm'n, 197 Va. 69, 77, 87 S.E.2d 769, 774 (1955) (observing that a body created by the legislature is "wholly limited in its power and authority by the law of its creation" and thus is not "vested with discretion to ignore or transgress statutory limitations, even to accomplish what it may deem to be desirable ends, nor does the acquiescence in, or the failure to object, on the part of others lend validity to any such departure").

The Director missed the deadlines not because of any IFFC continuances requested by Thornton Hall, but because of the Director's mistaken view that the statutory deadline was merely directory rather than mandatory — the very position he unsuccessfully advocated in Liberty Nursing Home, Inc., 31 Va. App. at 288, 522 S.E.2d at 893. The Director cannot now claim he relied to his detriment on some act or statement by Thornton Hall in missing the deadlines and that, but for his reliance, he would have avoided the consequences of missing the deadlines. By his own admission, he did not believe there were any consequences. We find no error, therefore, in the trial court's refusal to toll the statute of limitations on equitable estoppel grounds.[8]

III.

Under Code §§ 32.1-325.1(A) and 32.1-325.1:1(B), the "initial determination" must be made in accordance with the IFFC procedures of Code § 2.2-4019 of the Virginia Administrative Process Act. The trial court, therefore, correctly found that DMAS failed to make its initial determinations within the four-year limitation period set forth in Code § 32.1-325.1:1(B). We further find that the trial court did not err by refusing to equitably toll the limitations period in this case. For these two reasons, we affirm.

Affirmed.

---

[8] On this issue, DMAS's appeal brief states the "question presented" as whether the trial court "erred in failing to apply the long-standing doctrine of equitable tolling/estoppel in this case." DMAS does not address whether, independently of any equitable estoppel and tolling concerns, Thornton Hall nevertheless waived any statutory right to an IFFC initial determination within the four-year limitation period. While Code § 2.2-4019(A) permits the provider and the agency to waive the IFFC, waiver generally "will be implied only upon clear and unmistakable proof of the intention to waive such right for the essence of waiver is voluntary choice." King v. Commonwealth, 264 Va. 576, 581, 570 S.E.2d 863, 865 (2002) (citation omitted). We need not address that issue here, however, because DMAS limited its argument on appeal solely to equitable estoppel and tolling principles.